Below is an opinion of the court.

THOMAS M. RENN

U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>JAMES ANDREW BUSSMANN,<br><br>                    Debtor. | Case No. 21-61160-tmr12<br><br>MEMORANDUM DECISION ON<br>MOTION TO DISMISS[1] |

**Introduction:**

      The present matter comes before the court on the Sisters' Motion to Dismiss Chapter 12 Case filed by Elizabeth Potter, Sara Strain, Jennifer Isenhart, and Mary Kistner (self-identified as the Sisters). ECF No. 179. This memorandum delivers the court's ruling on the motion to dismiss.

**Facts:**

      Debtor, James Bussmann, filed his chapter 12 petition on July 6, 2021. The parties are familiar with the factual details, so I do not restate them here except as directly relevant to this

---

[1] This disposition is specific to this case. It may be cited for whatever persuasive value it may have.

Page 1 of 31 - MEMORANDUM DECISION ON MOTION TO DISMISS

ruling. The Sisters argue that Debtor is not eligible for chapter 12 relief, because he does not qualify as a family farmer because a majority of his debts did not arise out of a farming operation. Debtor argues that he is eligible for chapter 12 relief. The parties have submitted their testimony and other evidence, they have completed their briefing and arguments, and the matter is ripe for decision. For the reasons stated below, the motion to dismiss is granted.

**Chapter 12 Eligibility Standards:**

Chapter 12 eligibility is governed by 11 U.S.C. § 109(f),[2] which states that "[o]nly a family farmer or a family fisherman with regular annual income may be a debtor under chapter 12 of this title." Section 101(18) states in relevant part that a "family farmer" is an "individual…engaged in a farming operation…not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual…unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual…." A "farming operation," as defined in § 101(21), "includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." This list is not exclusive, and the definition of "farming operation" should be broadly construed. *See In re Sugar Pine Ranch*, 100 B.R. 28, 31 (Bankr. D. Or. 1989). The debtor has the burden to prove chapter 12 eligibility. *See In re Cooper*, No. 10-66447, 2011 WL 3882278, at *1 (Bankr. D. Or. Sept. 2, 2011) (citing *In re Powers*, No. 10-14557, 2011 WL 3663948, at *1 (Bankr. N.D. Cal. Aug. 12, 2011)); *see also NetJets Aviation, Inc. v. RS Air, LLC, (In re RS Air, LLC)*, 638 B.R. 403, 414 (9th Cir. BAP 2022) (subchapter V case) (citing *First*

---

[2] Unless otherwise indicated, all chapter and section references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532.

*Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 705 (10th Cir. 2014)). "The Ninth

Circuit Court of Appeals has held, in the Chapter 13 context, that 'eligibility should *normally* be

determined by the debtor's originally filed schedules, checking only to see if the schedules were

made in good faith.'" *In re Osborne*, 323 B.R. 489, 492 (Bankr. D. Or. 2005) (citing *Scovis v.*

*Henrichsen (In re Scovis)*, 249 F.3d 975, 982 (9th Cir. 2001) (emphasis added in *Osborne*)). In

this case, the schedules can be consulted for a list of creditors and amounts owed, but many of

the disputes relate to the nature of the debts which are not described in the schedules.

The Ninth Circuit has not described a test to determine a debtor's eligibility for chapter

12 relief under the requirements of § 109(f). In this District, however, a "totality of the

circumstances" test has been applied in chapter 12 cases to determine whether a chapter 12

debtor is engaged in a "farming operation." *See Sugar Pine Ranch*, at 31; *In re Jones,* No. 10-

65478, 2011 WL 3320504, at *2 (Bankr. D. Or. Aug. 2, 2011); *Cooper*, at *1; *In re Mikkelsen*

*Farms, Inc.*, 74 B.R. 280, 285 (Bankr. D. Or. 1987). In that analysis, the Oregon courts have

considered the following factors:

1. Whether the location of the operation would be considered a traditional farm;
2. The nature of the enterprise at the location;
3. The type of product and its eventual market, although the court should not be limited to products and produce which are traditionally associated with farming in the state of the court's location. Debtors should not be denied the protection of the Bankruptcy Code merely because their endeavors are not found in the laundry list of Old McDonald's Farm;
4. The physical presence or absence of family members on the farm;
5. Ownership of traditional farm assets;
6. Whether the debtor is involved in the process of growing or developing crops or livestock; and
7. Perhaps the key factor is whether or not the practice or operation is subject to the inherent risks of farming.

*See Jones*, at *2-3 (citing *Sugar Pine Ranch*, at 31).[3]

**Analysis:**

In their motion to dismiss, the Sisters point to a number of disputed debts, arguing they are not farming debts and therefore preclude Debtor's eligibility for chapter 12. Before I address the disputed debts, I note the parties have agreed the following farm and non-farm debts are undisputed.

| Farm Debts | |
| --- | --- |
| $13,067 | John Deere Financial – Gator Loan (Claim 4) |
| $13,651 | Northwest Farm Credit – "Water Loan"[4] |

| Non-Farm Debts | |
| --- | --- |
| $47,591 | Flagstar mortgage on North Bend residential rental (Claim 5) |
| $13,591 | Oregon Community Credit Union recreational trailer loan (no POC) |
| $27,187 | Rogue Credit Union – co-signed loan for stepson's car (Claim 1) |

In reviewing the remaining debts, I consider their relationships to the businesses associated with Debtor. Those businesses include JWB Livestock, LLC, JWB Cranberries, LLC, Bussmann Cranberries, LLC, and Stone Age Farm. I consider each of the businesses and their associated debts to determine whether the debts arose out of a farming operation. I address at the end those debts that are not clearly associated with a single business.

///

---

[3] The parties have raised the Tenth Circuit *Woods* case standard to apply in a chapter 12 eligibility determination. Although the Ninth Circuit has not identified an applicable test, I find no reason to apply the Tenth Circuit test given that the Oregon Bankruptcy Court has previously applied the totality of the circumstances test. Also, the dispute in the *Woods* case was limited to whether the debt for the debtor's residence "arises out of a farming operation." *Woods*, at 691.
[4] The parties initially disputed whether this debt arose out of a farming operation, but Mr. VanLeuven's correspondence after the hearing on the motion to dismiss indicates that this debt was "proved or conceded" to be a farm debt. ECF No. 211.

## I.    JWB Livestock, LLC

First, the disputed debts related to JWB Livestock, LLC, are the Bank of America – JWB Livestock Visa Bill (Exhibit 8), and the Northwest Community Credit Union Tahoe Loan (Exhibit 17).[5]

To determine whether the associated debts arise out of a farming operation, I start by determining whether JWB Livestock, LLC, is a farming operation. The Sisters argue that JWB Livestock, LLC, is not a "farming operation" as described in § 101(21) but is instead a cattle broker which buys cattle at auction and immediately ships them directly to a buyer. During the hearing, Debtor testified about the history of JWB Livestock, LLC, stating that it was in the business of raising, buying, and selling cattle for over twenty years. He testified that young cows were brought to the farm to acclimate, then were shipped elsewhere. Debtor also testified, however, that JWB Livestock, LLC, stopped running its own herd around 2017, noting that his father would go to the cattle auctions, purchase cattle, and ship them to the buyer without ever bringing the cattle to Debtor's farmland.

Based on Debtor's testimony, it is clear the nature of the business has evolved over the years. I find that prior to 2017, JWB Livestock, LLC, was a farming operation. Applying the totality of the circumstances test, factors 6 and 7 weigh heavily in favor of that finding. Debtor was involved in the process of developing livestock (factor 6), which he testified that he raised on his land, and his practice was subject to the inherent risks of farming (factor 7). The success of the operation was tied directly to whether the cattle survived and could be sold. Starting in

---

[5] Although Debtor testified the Northwest Farm Credit line of credit (Exhibit 111) and the 2021 secured line of credit advances received from Diana Bussmann (Exhibits 11, 12, 13, 14, 15, and 16), were related to JWB Livestock, LLC, I find that analysis of these debts is more clearly addressed separately.

2017, however, Debtor testified that the nature of his operation had changed, noting that cattle were purchased at auction and then shipped directly to a buyer. "As one Oregon bankruptcy court succinctly stated: 'The mere purchase and sale of farm by-products is not necessarily a 'farming operation.'" *Cooper*, at *2 (citing *Fed. Land Bank of Columbia v. McNeal (In re McNeal)*, 848 F.2d 170, 172 (11th Cir. 1988)). I find that, at that point in 2017, JWB Livestock, LLC, was no longer a farming operation either involved in the process of developing livestock or inherently tied to the risks of farming.

The debts associated with JWB Livestock start with the Bank of America – JWB Livestock Visa Bill, dated August 25, 2021. Exhibit 8. Debtor testified that Bank of America sent the bill to himself, James A. Bussmann, Sr., and JWB Livestock, LLC. Debtor filed his voluntary petition on July 6, 2021, after the time that JWB Livestock, LLC, shifted from a cattle farming operation to a cattle brokerage. Although he failed to provide any invoices or receipts supporting the charges, Debtor testified that this credit card was used for business related to JWB Livestock, LLC, including expenses like vehicle maintenance for vehicles that he drove to the cattle auction. Based on evidence that the credit card was used exclusively for the business of JWB Livestock, LLC, I find that the debt represented by the Bank of America – JWB Livestock Visa Bill in the amount of $436.28 did not arise out of a farming operation and is not a farm debt. It will be counted as a non-farm debt in the eligibility calculation.

Next, I discuss the Northwest Community Credit Union Tahoe Loan in the amount of $30,807.40.[6] Exhibit 17. Debtor testified that the Tahoe originally belonged to his former spouse,

---

[6] During closing arguments, the parties discussed the Tahoe loan amount. Mr. Boyd argued that the amount should be $30,788.47, plus interest at 4.49%. Mr. VanLeuven argued that this calculation placed the loan amount at $30,807.40. The original loan amount presented by the parties was $30,074, which represents the outstanding loan amount as of July 28, 2021. *See* Exhibit 1, Exhibit 112. As it is unclear whether the number argued by Mr. Boyd includes the

Wendy Bussmann, and was her daily driving car. This background was corroborated by the testimony of Elizabeth Potter who stated that she knew the Tahoe was Wendy Bussmann's and saw Wendy Bussmann driving it prior to Debtor's ownership of the vehicle. Debtor testified that when he was getting a divorce, he took out the loan in October 2018 to purchase the vehicle from his former spouse because she could no longer afford it. He further testified that JWB Livestock, LLC, used the vehicle as part of its operation, noting that it was driven by his father, his cousins, or himself to cattle auctions. Debtor additionally testified that he sometimes used the vehicle for cranberries, specifically his operation of JWB Cranberries, LLC. This testimony conflicted with testimony from Elizabeth Potter, who testified that Debtor rarely drove the Tahoe, that he never drove it to the cattle auctions, and that the vehicle has been kept in a storage building on Debtor's property.

Although conflicting testimony exists, it does not change my finding that the Tahoe loan is not a debt arising out of a farming operation. As noted above, JWB Livestock, LLC, ceased to be a farming operation in 2017 when it no longer raised its own herd of cattle. Debtor obtained the loan for the Tahoe in late October 2018, after the time JWB Livestock, LLC, could be considered a farming operation. Given Debtor's testimony that the primary use of the vehicle was for JWB Livestock, LLC, and the finding that the company had ceased to operate as a farm at the time the loan was obtained, I find this debt did not arise out of a farming operation, and therefore is not a farm debt. It will be counted as a non-farm debt in the eligibility calculation.

///

///

---

interest to filing, I find the $30,807.40 appears to be close to that amount, and therefore use it in my calculation.

## II.  JWB Cranberries, LLC

Based on Mr. VanLeuven's correspondence, I find there are no debts solely associated

with JWB Cranberries, LLC, that remain in dispute regarding whether they are debts arising

from a farming operation. *See* ECF No. 211, stating that the Northwest Farm Credit – "Water

Loan," which was the only disputed loan solely associated with JWB Cranberries, LLC, is

"proved or conceded" to be a farm debt.

## III.  Bussmann Cranberries, LLC

The disputed debts solely associated with Bussmann Cranberries, LLC, are the Luvaas

Cobb legal fees (Exhibits 9 and 10), and the Umpqua Bank – Guaranty of Loan to Bussmann

Cranberries, LLC (Exhibit 20).

The Luvaas Cobb legal fees in the amount of $119,964 are not disputed in amount.[7] The

Sisters argue that the legal fees did not arise out of a farming operation, but "arose out of legal

services rendered defending claims of fraud, breach of fiduciary and self-dealing in management

of a limited liability company (Bussmann Cranberries, LLC) in which debtor was 1/7th owner."

ECF No. 179, page 5. Debtor argues that the litigation is "directly related" to his personal

farming operation and Bussmann Cranberries, LLC, which was also operated by Debtor. ECF

No. 194, page 3.

As an initial matter, the parties appear to have no dispute over whether Bussmann

Cranberries, LLC, is a farming operation. Debtor testified that Bussmann Cranberries, LLC, is a

cranberry farm that was owned in equal shares by himself, his two brothers, and his four cousins,

---

[7] The parties initially disputed the amount of the debt, with Debtor contending that his liability
was only for half of the claimed amount. Exhibit 1, footnote 3. During closing arguments,
Debtor's counsel acknowledged based on the evidence presented and accepted that Debtor was
liable for the full debt amount of $119,964. I agree with that conclusion. Therefore, I find no
dispute remains regarding the amount of the debt, which is $119,964.

the "Sisters" in this case. He further testified that the LLC started solely as a farming operation that grew cranberries, but eventually it diversified and expanded to include a cranberry processing operation. He testified that expanding the business into a processing operation would allow the business to mitigate the risks of being a farmer. Based on Debtor's testimony, I find that Bussmann Cranberries, LLC, is a farming operation.

The dispute at issue is whether legal fees, associated with litigation related to a farming operation, are debts "arising out of a farming operation." To be clearer, the litigation involved a dispute among the owners of an LLC that owned and operated a farming operation. Neither the Ninth Circuit, nor the Oregon Bankruptcy Court has addressed this issue, with the Oregon courts focusing their chapter 12 analysis only on whether certain organizations qualify as "farming operations." *See* cases cited above in the Chapter 12 Eligibility Standards section, page 2.

In answering this question, I turn to a Georgia case for helpful guidance. *In re Saunders*, 377 B.R. 772 (Bankr. M.D. Ga. 2007) (gathering similar cases). In *Saunders*, the court looked to other bankruptcy courts in addressing the question of whether certain debts arise out of a farming operation for eligibility determinations. In reviewing the other decisions, the *Saunders* court found that "[t]he majority have focused on the purpose of the debt – whether it was incurred and the proceeds used for the farming operation." *Saunders*, at 774. Some cases it reviewed included a Rhode Island case that found "[t]he criteria for determining whether debt arises out of a farming operation are: (1) the reason or purpose for which the debt was incurred, and (2) the use to which the borrowed funds were put." *In re Teolis*, 419 B.R. 151, 161 (Bankr. D.R.I. 2009) (citing *In re Douglass*, 77 B.R. 714, 715 (Bankr. W.D. Mo. 1987)); and an Iowa case where the court held that debts from the settlement of a lawsuit about a will dispute may still be a debt arising out of a farming operation, depending on the nature of the transaction and its relation to

the debtor's farming operation. *In re Rinker*, 75 B.R. 65, 68 (Bankr. S.D. Iowa 1987). The *Saunders* court stated that the *Rinker* court found "a direct link between the basis of the lawsuit and subsequent settlement and the farming operation. The siblings were fighting over the farmland, which was necessary to the debtor's farming operation, and the debtor settled the suit to preserve his farming operation. In such circumstances, the relationship between the subject of the settlement and the farming operation … is clear and direct." *Saunders*, at 775. An Oklahoma court cited by *Saunders* focused on the use of the funds by stating that "the proceeds of the loan must in some way be directly applied to or utilized in the farming operation." *In re Kan Corp.*, 101 B.R. 726, 727 (Bankr. W.D. Okla. 1988) (loan used to purchase beer distributorship was not farm debt). Overall, the *Saunders* court concluded that "to 'arise out of a farming operation' the purpose of a debt must have some connection to the debtor's farming activity. Merely using farmland as collateral for a debt that has no other relation to the farming activity will not suffice." *Saunders*, at 776.

   Debtor testified to being a 1/7 owner of Bussmann Cranberries, LLC, and he served as a member and manager of the company at the time of the bankruptcy filing. His role in the business, however, does not automatically make the debt a farm debt. The legal fees Debtor incurred arose directly from litigation related to the ownership and operation of Bussmann Cranberries, LLC, and the Stone Age Farm property, but the purpose of incurring the debt was not connected to the farming activity. To the contrary, the Sisters' litigation claims against Debtor were related to alleged improper conduct of the defendants, including Debtor, and not to activities connected with the farming operation. Those claims included breach of fiduciary duty, oppression, unjust enrichment, conversion, fraud, expulsion of a member, and other actions related to the individual acts of Debtor and not to any farming activity. *See* Third Amended

Complaint, ECF No. 21, Exhibit 1. Some courts have recognized that farming operations may include the business management aspects of a farm. *See In re Mongeau*, 633 B.R. 387, 395 (Bankr. D. Kansas 2021) (modern farming includes much more than just working the land). Although I agree that the management aspects of the farm may directly relate to the farming operation, the legal fees in this case were not related to the management aspects of any farming activity. They related to allegations about improper individual conduct unrelated to the farming operation. For this reason, the Luvaas Cobb legal fees are not connected to any farming activity and, therefore, are not debts arising out of a farming operation and must be included as a non-farm debt in the eligibility calculation.

Finally, I address the Umpqua Bank guaranty of loan to Bussmann Cranberries, LLC, in the amount of $313,534. On May 21, 2012, Bussmann Cranberries, LLC, took out an agricultural loan from Umpqua Bank, in the amount of $630,000. Exhibit 19. Debtor, and six other members of Bussmann Cranberries, LLC, guaranteed the loan. Exhibit 19, page 3; Exhibit 20. The Sisters raise two specific arguments with respect to this debt. First, that Debtor's guaranty of the Umpqua Bank loan is a contingent debt, and therefore should not be included in the § 101(18) calculation; and second, that the loan guaranty does not arise from Debtor's farming operation. Debtor disagrees.

Under § 101(18), only those debts that are noncontingent and liquidated are included as part of the 50 percent number required in the eligibility calculation. "[A] contingent debt is 'one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor.'" *Fostvedt v. Dow (In re Fostvedt)*, 823 F.2d 305, 306 (9th Cir. 1987) (citing *Brockenbrough v. Commissioner*, 61 B.R. 685, 686 (W.D. Va.1986).

In this case, the debt at issue is Debtor's guaranty of the loan from Umpqua Bank to Bussmann Cranberries, LLC. Exhibit 20. Interpretations of a guaranty are a matter of state law. Under Oregon law, "[a] guaranty is an absolute undertaking to pay the debt when due, and is not discharged by the failure of the creditor to exhaust his remedy against the principal debtor." *Michelin Tire Co. of Cal. v. Cutler*, 116 Or. 217, 219 (1925) (citing *Gile Grocery Co. v. Lachmund*, 75 Or. 122 (1915)).

The Sisters contend that Debtor's guaranty of the loan is contingent, because the primary obligor, Bussmann Cranberries, LLC, was current on the loan and had not missed payments. They note that Umpqua Bank did not file a proof of claim in the case. Additionally, the Sisters argue that, although the Umpqua Bank loan terms listed the appointment of a receiver for Bussmann Cranberries, LLC, as an event of default, Bussmann Cranberries, LLC, had the ability to cure, and the bank never sent the required notice to trigger a cure deadline. ECF No. 198, page 7. Debtor argues the opposite, stating that his guaranty of the Umpqua Bank loan is not contingent. I agree with Debtor.

On May 21, 2012, Debtor signed a Commercial Guaranty which personally guaranteed the loan between Bussmann Cranberries, LLC, and Umpqua Bank. Exhibit 20. The Guaranty states in relevant part:

> This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness.
> …
> Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.
> …
> Except as prohibited by applicable law, Guarantor waives any right to require Lender (a) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action

or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations….

…

GUARANTOR'S WAIVERS. Except as prohibited by applicable law, Guarantor waives any right to require Lender…(B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of the Borrower….

Exhibit 20, pages 1-2.

The related Agricultural Security Agreement between Bussmann Cranberries, LLC, and

Umpqua Bank was updated and the Changes in Terms Agreement, reads in relevant part:

DEFAULT. Each of the following shall constitute an Event of Default under this Agreement: …
Insolvency….the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property…
Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness…
…
Cure Provisions. If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12 months), it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.
…
CONTINUING VALIDITY. Except as expressly changed by this Agreement, the terms of original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.

Exhibit 19, pages 9-10.

The original Agricultural Security Agreement also contained the following language:

EFFECT OF AN EVENT OF DEFAULT. If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents…all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional.

Exhibit 19, page 5.

In this case, two of the Events of Default have occurred: (1) a receiver was appointed for Bussmann Cranberries, LLC, and (2) a Guarantor of the Indebtedness, here Debtor, became insolvent, based on the chapter 12 filing on July 6, 2021. A debt is noncontingent if all events giving rise to liability occurred prior to the filing of the bankruptcy petition. *See In re Croney*, No. 11-10836, 2011 WL 1656371, at *2 (Bankr. W.D. Wash. May 2, 2011) (citing *In re Loya*, 123 B.R. 338, 340 (9th Cir. BAP 1991)). In this instance, the appointment of the receiver in July 2020, occurred before the filing of Debtor's bankruptcy petition in July 2021. Under the terms of the Agricultural Security Agreement, the occurrence of this Event of Default (appointment of a receiver) meant the debts immediately became due. For this reason, the debt is noncontingent.

The Sisters raise a second argument that the bank either waived its right to pursue the guarantors because of the receivership, or it should be held to have deemed to have accepted Bussmann Cranberries, LLC's, response to the receivership as a cure, and therefore the Bank's claims against Debtor remain contingent as of the petition date. ECF No. 198, page 8. The Sisters cite to the fact that the bank "never sent a cure notice due to the receivership and never made any kind of demand on the guarantors." ECF No. 198, page 8. I do not find this argument persuasive. The terms of the Agricultural Security Agreement specifically address the issue of waiver, and state the following:

> No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.

Exhibit 19, page 27. Despite Umpqua Bank's inaction, the terms of the agreement specifically state that the bank's lack of action will not operate as a waiver.

Finally, the case the Sisters cite to support their argument is not persuasive. In *Kaplan*, the bankruptcy court held that a guarantee was contingent even though the loan was in default, because the lender decided to restructure the loans instead of pursuing its remedies. *In re Kaplan*, 186 B.R. 871, 877 (Bankr. D.N.J. 1995). The facts here differ, as Umpqua Bank did nothing to affirmatively restructure or otherwise forgive or excuse the default. Umpqua Bank never acted, and therefore it cannot be deemed to have waived its ability to collect based on the terms of the agreement. For these reasons, I find Debtor's guaranty of the Umpqua Bank loan is not contingent.

Next, I must address the Sisters' argument that the Umpqua Bank loan guaranty did not arise from Debtor's farming operation. ECF No.198, page 9. In making this argument, the Sisters contend that the Umpqua Bank loan was used to finance Bussmann Cranberries, LLC's, upgrade of a cleaning line in its processing plant. Debtor's testimony supports this statement, noting that the $600,000 loan was used to expand the cleaning business of Bussmann Cranberries, LLC. He testified that the cleaning plant at Bussmann Cranberries, LLC, was built in 2003, but in 2019 it purchased its own equipment for harvesting, noting that prior to that time it had borrowed equipment.

The Sisters cite to the three tests from the Tenth Circuit *Woods* case to provide guidance in determining whether a debt arises out of farming operation, but the *Woods* case dealt only with a debt for the debtor's principal residence. *Woods*, at 691. Here, I choose to use the "some-connection" test, which states that "to 'arise out of a farming operation' the purpose of a debt must have some connection to the debtor's farming activity." *Saunders*, at 776. The Umpqua Bank loan was taken out to purchase cranberry cleaning and processing equipment for Bussmann Cranberries, LLC. Debtor was a partial owner of Bussmann Cranberries, LLC. He filed his

bankruptcy in July 2021. The state court judgment paragraph 8, states the following with respect to membership interests in Bussmann Cranberries, LLC:

> "Defendants …. James A. Bussmann shall transfer the entirety of their membership interests to Plaintiffs Sara L. Strain, Elizabeth L. Potter, Jennifer L. Isenhart, and Mary L. Kistner, pro rata as follows:
> …
> d. All membership units issued to and/or owned by Defendant James A. Bussmann shall be deemed to be sold and transferred by James A. Bussmann and, as applicable, his bankruptcy estate, and purchased by Plaintiffs Sara L. Strain, Elizabeth L. Potter, Jennifer L. Isenhart, and Mary L. Kistner, pro rata, for a total price of $306,000, effective on the date on which the following have occurred: (1) entry of this judgment; and (2) entry of an order in James A. Bussmann's bankruptcy case (Case No. 21-61160-tmr12 pending in the United States Bankruptcy Court in the District of Oregon) either (a) directly or indirectly authorizing such deemed purchase ender this judgment to take effect, or (b) dismissing such bankruptcy case;"

Exhibit 4, pg. 10-11.

The state court decision requiring Debtor to sell and transfer his rights to Bussmann Cranberries, LLC, was not entered until March 1, 2022, after Debtor filed his bankruptcy case. Therefore, at the date of filing, Debtor still owned a part of Bussmann Cranberries, LLC. The Sisters' attempt to argue that Debtor's farming operation did not include Bussmann Cranberries, LLC, but I think that is erroneous. Debtor's debts must arise from farming operations that were owned or operated by Debtor, and Debtor did both for Bussmann Cranberries, LLC, at the time of the bankruptcy filing. For these reasons, I find Debtor's guaranty of the Umpqua Bank loan is not contingent and arises out of Debtor's farming operation. Therefore, this debt will be included as a farm debt in the eligibility calculation.

## IV.    <u>Stone Age Farm</u>

Next, I turn to the analysis of Stone Age Farm and its associated debt. The debt at issue is the loan identified in Exhibit 2, POC #203-2, filed by creditor Northwest Farm Credit Services, in the amount of $321,158.96. A copy of the note, signed on September 20, 2016, by Debtor,

George Bussmann, and Diane Bussmann, is included as Exhibit 3. The parties represented during the hearing that the amount of the loan is undisputed and are further in agreement that the Stone Age Farm property was a farming operation. The Sisters argue that it is unclear whether this debt arises out of a farming operation owned or operated by the Debtor, noting that although Debtor was "nominally in title to the [property] with his brother and sister-in-law on the petition date, the state court found that they held Stone Age Farm in constructive trust for Bussmann Cranberries, LLC through the petition date." ECF No. 179, pages 2-3.

First, I agree with the parties that the Stone Age Farm property was a farming operation. Debtor testified that the property was purchased to operate as a cranberry farm, had eleven cranberry bogs, and had its own equipment including a cranberry picker and an elevator, which was similar in set-up to his own cranberry farm. When asked whether the property was used for anything other than farming, Debtor noted that there were a couple houses on the property where his nephew and niece paid rent and lived, but overall, the property was "all cranberry." Debtor further testified that prior to entry of the state court judgment requiring the turnover of the Stone Age Farm property to Bussmann Cranberries, LLC, he, George, and Diane were growing and harvesting crops on the property.

The issue becomes whether the debt associated with this property is a debt arising out of a farming operation "owned or operated by" the Debtor such that it counts in the farm-debt calculus under § 101(18). The Sisters focus their argument on Debtor's ownership interest in the property, arguing that Debtor owned "a nominal 50% interest in the StoneAge [sic] property." ECF No. 198, page 10. The Sisters cite to § 541(b)(1), which states that property of the estate does not include "any power that the debtor may exercise solely for the benefit" of another; and § 541(d), which excludes from the bankruptcy estate property "in which the debtor holds, as of

the commencement of the case, only legal title and not an equitable interest." ECF No. 198, page 10. The Sisters point to the fact that the state court entered judgment against Debtor and his brother and placed the Stone Age Farm property in constructive trust for the benefit of Bussmann Cranberries, LLC, relating back to 2016. For this reason, the Sisters argue that the Stone Age Farm property was never property of the bankruptcy estate.

Section 101(18) states that a "family farmer" is an "individual…engaged in a farming operation…not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual…unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation **owned or operated by such individual**…" § 101(18) (emphasis added). Although the Sisters focus on Debtor's ownership of the property, the farming operation may also be operated by Debtor in order to be included in the calculus.

With respect to ownership of the property, Debtor, George Bussmann, and Diane Bussmann took out the Northwest Farm Credit Services loan to purchase the Stone Age Farm property. Debtor, George Bussmann, and Diane Bussmann, individually, signed the loan documents on September 20, 2016. Exhibit 3. Debtor testified that he owned 50% of the property, and the remaining 50% was owned by George and Diane Bussmann. Ownership of the property, however, is not that simple. The evidence shows that the Stone Age Farm property was a source of dispute between the Sisters on one part, and Debtor, George Bussmann, and Diane Bussmann on the other. Debtor mentioned the state court proceedings in his testimony, noting that he conveyed his interest in the Stone Age Farm to Bussmann Cranberries, LLC, only because of the judgment entered in the Coos County Circuit Court.

I take note of the general judgment entered on March 1, 2022, in the Coos County Circuit

Court Case No. 20CV22959. The general judgment states:

> [o]n the Second, Third, Fifth, and Sixth Claims for Relief, a constructive trust in favor of Bussmann Cranberries, LLC is imposed on the property described in the attached Exhibit C ("Stone Age"), including equipment, improvements, water rights, and any other property or rights appurtenant to Stone Age or conveyed in connection with the 2016 sale of Stone Age to Defendants George P. Bussmann, James A. Bussmann, and Diane G. Bussmann…..

> Exhibit 4, page 7.

It further states that:

> [t]he effective date of the constructive trust shall relate back to September 28, 2016, the date on which Defendants George P. Bussmann, James A. Bussmann, and Diane G. Bussmann acquired Stone Age.

> Exhibit 4, page 7.

Black's Law Dictionary defines a "constructive trust" as:

> [a]n equitable remedy by which a court recognizes that a claimant has a better right to certain property than the person who has legal title to it. This remedy is commonly used when the person holding the property acquired it by fraud, or when property obtained by fraud or theft (as with embezzled money) is exchanged for other property to which the wrongdoer gains title. The court declares a constructive trust in favor of the victim of the wrong, who is given a right to the property rather than a claim for damages. The obligation of the constructive trustee is simply to turn the property over to the constructive beneficiary; the device does not create a 'trust' in any usual sense of that word….

> Black's Law Dictionary, 11th Edition, 2019, definition: "constructive trust."

Constructive trusts are imposed by courts to prevent unjust enrichment. *In re Advent*

*Management Corp.*, 178 B.R. 480, 486 (9th Cir. BAP 1995), *aff'd*, 104 F.3d 293 (9th Cir. 1997).

The Ninth Circuit, in reviewing ownership interests related to constructive trusts has stated the

following:

> In the case of funds held by a debtor in constructive trust for another person, the equitable interest in the trust funds belongs to the trust beneficiary, not the debtor. Accordingly, this court held in *Unicom* that funds held by a debtor in constructive trust are neither

"property of the estate" under § 541(d), nor an "interest of the debtor in property" under § 547(b).

*In re Advent Mgmt. Corp.*, 104 F.3d 293, 296 (9th Cir. 1997) (citing *In re Unicom Comput. Corp.*, 13 F.3d 321, 324 (9th Cir. 1994)). Further, when reviewing a constructive trust, the Ninth Circuit recognized that

> [a]lthough we have never expressly held that the same rule (viz., funds held in trust are property neither of the debtor nor of the bankruptcy estate) should apply as well to situations involving funds held by a debtor in constructive trust, the rule would seem to apply with equal force to both situations. For example, the legislative history to section 541 indicates that property held in constructive trust should not be considered property of the debtor….

*Unicom*, at 324.

Here, Debtor originally acquired title to the Stone Age Farm property when it was purchased. After entry of the state court judgment, however, Debtor, along with George Bussmann and Diane Bussmann, held the Stone Age Farm property in constructive trust in favor of Bussmann Cranberries, LLC, with the constructive trust relating back to September 28, 2016. Exhibit 4, page 7. Therefore, after the imposition of the constructive trust, Debtor was not an owner of the Stone Age Farm property. As previously discussed, however, Debtor remained a partial owner of Bussmann Cranberries, LLC, until after the filing of his bankruptcy. (*See* Umpqua Bank guaranty of loan section). Because Debtor retained an ownership interest in Bussmann Cranberries, LLC, which was the beneficiary of the constructive trust established relating to the Stone Age Farm property, I find that Debtor owned the Stone Age Farm property, and therefore the debt associated with it is a debt arising out of a farming operation owned by the Debtor. It will be counted as a farm debt in the eligibility calculation.

Additionally, the state court entered its judgment after the filing of bankruptcy case. Thus, on the date of the filing, Debtor owned the property. The timing of the judgment, even

with the earlier effective date imposed by the state court, makes a difference in this analysis. *See Airwork Corp. v. Markair Express, Inc. (In re Markair, Inc.)*, 172 B.R. 638, 642 (9th BAP 1994) (property only excluded if constructive trust was imposed prepetition).

Even if the parties disagree with the ownership analysis, I still find that Debtor operated the Stone Age Farm property as of the date of the bankruptcy filing. Debtor testified that he, George Bussmann, and Diane Bussmann operated the farm prior to being directed to deed it to Bussmann Cranberries, LLC. The operations included growing and harvesting the cranberry crop, clearly farming operations. The state court judgment reads:

> Defendant James A. Bussmann shall convey the entirety of his interest in Stone Age, together with its improvements, fixtures, crops, and water rights, to Bussmann Cranberries LLC as grantee by warranty deed, free of all monetary liens and obligations except liability for the trust deed or mortgage incurred to purchase the property in 2016…no later than three business days after the date on which the following have occurred: (1) entry of this judgment; and (2) entry of an order in James A. Bussmann's bankruptcy case (Case No. 21-61160-tmr12 pending in the United States Bankruptcy Court in the District of Oregon) either (a) directly or indirectly authoring such conveyances to take effect, or (b) dismissing such bankruptcy case.

Exhibit 4, pages 9-10.

The judgment was not entered until March 1, 2022. Exhibit 4, page 18. Debtor filed his bankruptcy prior to the requirement for him to convey the Stone Age Farm property to Bussmann Cranberries, LLC. At the time Debtor filed bankruptcy, I find that Debtor operated the farm, and thus the associated debt arising from the Stone Age Farm property is a debt arising out of Debtor's farming operation. It will be counted as a farm debt in the eligibility calculation.

## V. **Miscellaneous Debts**

Finally, I address the miscellaneous debts that are not easily associated with one entity. These include the Northwest Farm Credit – Line of Credit, the Diana Bussmann 2021 secured line of credit advances, and the Flagstar home mortgage loan.

First, I consider the Northwest Farm Credit line of credit in the amount of $94,848. Exhibit 110. (No Proof of Claim was filed relating to this debt.) In Joint Exhibit 1, the parties note that they do not agree on the amount of the debt and that it is subject to proof. The burden is on Debtor to prove eligibility, and that burden includes proving the amount of the debt here.

A copy of what appears to be the original loan agreement was filed as Exhibit 110, pages 21-37. The agreement, effective March 8, 2016, was made between the Lender, Northwest Farm Credit Services, FLCA, or Northwest Farm Credit Services, PCA, and Borrowers, James A. Bussmann individually, James A. Bussmann as Member of JWB Cranberries LLC, a Limited Liability Company, James A. Bussmann as Member of JWB Livestock LLC, a Limited Liability Company, and Wendy R. Boston-Bussmann. Ex 110, pages 21, 22, and 35. The agreement was signed by Debtor, individually, in his capacity as a member of both JWB Cranberries, LLC, and JWB Livestock, LLC, and by Wendy R. Boston-Bussmann, individually. Ex 119, page 35. An updated note showing the Revolving Line of Credit dated March 18, 2021, shown in Exhibit 110, pages 1-3, was signed by James A. Bussmann, individually, and as a member of JWB Cranberries, LLC, and JWB Livestock, LLC.

Debtor testified that this loan was a revolving line of credit from Northwest Farm Credit, and that he used the loan for both livestock and cranberries. The revolving line of credit allowed him to draw a check, but that the line of credit had to be brought to a zero balance for at least a month before he could draw from it again. When asked what percentage of the loan was used for livestock versus cranberries, he stated that he used half for each. The loan amounts used for cranberries was for operating expenses including fertilizer, irrigation, utilities, and labor. He additionally noted that the loan was renewed, which is why there are loan documents dated from different time periods.

There is limited information regarding the details of this revolving line of credit, particularly given that Debtor did not provide detailed receipts for the expenses associated with it. A transaction history from Northwest Farm Credit Services, dated from January 1, 2019, through April 11, 2022, is included in Exhibit 110, page 38. Diane Bussmann, Debtor's bookkeeper, testified that this transaction history was requested from Northwest Farm Credit Services because Debtor could not access the accounts. She further testified that the OLB ACH Out transactions listed on the transaction history represented amounts that were placed into Jim Bussmann's checking accounts, but that she had no idea what those advances were for and could not tell if they would have been used as payment of a retainer for bankruptcy counsel. She further noted that Debtor had separate accounts for JWB Livestock, LLC, and JWB Cranberries, LLC, but again it was unclear to which accounts these OLB ACH Out transfers were being made. With respect to Roth Enterprises, which is also listed on the transaction history, Debtor testified that Dennis Roth was a buyer who purchased livestock that JWB Livestock, LLC, purchased from auction. Debtor testified that there was a short-term ACH payment arrangement between Roth's accounts and Debtor's accounts where Roth's bank would deposit funds "into the line of credit."

Based on the limited evidence provided by the Debtor, I find that the Debtor has failed to meet his burden to show that the $94,848, is a debt arising out of a farming operation. The limited information that Debtor has provided makes it impossible for me to determine for what purpose the debt was incurred. The transaction history provided details about transactions after the filing of the bankruptcy, and those prior to the bankruptcy filing appear to either only be related to JWB Livestock, LLC, and transfers out to Debtor's checking accounts, but with no additional evidence or testimony provided to explain the transactions. For these reasons, I find

Debtor has failed to meet his burden to show this debt arises out of a farming operation and will treat this debt as a non-farm debt in the eligibility calculation.

Next, I address the Diana Bussmann 2021 secured line of credit advances in the amount of $506,413. Diana Bussmann filed a Proof of Claim for that amount. See Amended Exhibit 11. The Sisters argue that this debt did not arise out of a farming operation, and instead was used to pay off attorney fees and operating costs of JWB Livestock, LLC's business. ECF No. 179, page 3-4. Debtor argues that the loan from Diana Bussmann was used to pay off farming operation debt owed to Beef Steak Ranch. ECF No. 194, page 3.

At the hearing, Debtor testified that two checks he received from Diana Bussmann make up the balance of the loans to him, and that those checks were used to pay off the loan he received from Beef Steak Ranch. *See* Exhibits 12 and 13. Debtor testified that the loan amount he took out from Beef Steak Ranch was in the amount of $700,000. *See* Exhibit 14. Evidence of the checks used to pay off Beef Steak Ranch are seen at Exhibit 16, which includes a check in the amount of $254,191.52, and a second check in the amount of $250,229.74. It does appear that the Diana Bussmann loan amounts directly cover the loan obtained from Beef Steak Ranch. The issue now becomes whether that loan arose out of a farming operation.

Debtor testified that the Beef Steak Ranch loan was used to purchase equipment, including cranberry harvest equipment, trucks, a tractor, an attachment to pick crop, and for work done on a building. Specifically, Debtor testified that the Beef Steak Ranch loan was used for the following items:

- $54,000 to Timco Leasing, Inc., for Kenworth trucks for hauling cranberries (Exhibit 109, page 1, check dated 8/4/20; page 2 invoice for trucks, billed to JWB Cranberries)
- $81,000 to Eagle Truck and Equipment for flatbed trucks (Exhibit 109, page 3, check dated 8/5/2020; page 4 invoice for trucks, billed to JWB Cranberries)

- $18,265.07 to Pacific Ag Systems, Inc. (Exhibit 109, page 5, dated 8/6/2020, Debtor testified that this check was paid for work done on the frost system, which has to do with the irrigation system)
- $5,450 to Eagle Truck and Equipment for the freight cost (Exhibit 109, page 6, check dated 9/19/2020)
- $12,845.00 to Mike's Welding and Fabrication (Exhibit 109, page 7, check dated 10/2/2020; Debtor testified that this expense was for an attachment they made that is used to pick the cranberry bogs)
- $2453.00 to Bandon Concrete, LLC (Exhibit 109, page 8, check dated 10/6/2020; Debtor testified that this was for work done on the loading dock to allow cranberries to be hauled in and out)
- $19,999.50 to Luvaas Cobb (Exhibit 109, page 9, check dated 11/15/2020; Debtor testified that this was for legal fees for the dispute over the cranberry farm)
- $20,000 to Luvaas Cobb (Exhibit 109, page 10, check dated 11/15/2020; Debtor testified that this was also for legal fees for the dispute over the cranberry farm)
- $10,848.23 to Pape Kenworth (Exhibit 109, page 11, check dated 12/29/2020; Debtor testified that this was for work done on the trucks)
- $70,856.07 to Luvaas Cobb (Exhibit 109, page 12, check dated 1/19/2021; Debtor testified that this was for legal fees for the dispute over the cranberry farm)
- $20,835.50 to Luvaas Cobb (Exhibit 109, page 13, check dated 1/19/2021; Debtor testified that this was for legal fees for the dispute over the cranberry farm)
- $6,084.15 to CC Reporting & Videoconferencing (Exhibit 109, page 14, check dated 2/17/2021; Debtor testified that this was for paying for recording of depositions)
- $4,135.94 to Pape Kenworth (Exhibit 109, page 15, check dated 3/10/2021; Debtor testified that this was for repairs done on the trucks)
- $1,638.45 to Pacific Ag Systems, Inc. (Exhibit 109, page 16, dated 3/10/2021, Debtor testified that this check was for work done on the HMI system)
- $45,000 to Haueter's Bogs, Inc. (Exhibit 109, page 17, dated 6/2/2021, Debtor testified that this check was for a tractor with a mower for the bogs)

Total Amount Spent: $371,202.86.

The Beef Steak Ranch loan was incurred on July 22, 2020. Exhibit 14. At first glance it appears reasonable that the $700,000 amount was spent on the equipment described above for Debtor's JWB Cranberries, LLC, operation. However, I don't find that Debtor has met his burden in showing that the debt, represented by the Diana Bussmann line of credit, arose out of a farming operation. Exhibit 107 shows a check register for JWB Livestock, LLC, which shows a $700,000 deposit from Beef Steak Ranch, dated July 23, 2020. The payment amounts listed on the check register, all occurring after the check date, are related to JWB Livestock, LLC, and not

JWB Cranberries, LLC, as they are for livestock yards and auctions. Debtor's testimony was not consistent with the check register, as he claimed that the money from Beef Steak Ranch was used for the above listed expenses, which were all related to JWB Cranberries, LLC, and the litigation surrounding Bussmann Cranberries, LLC. Debts related to JWB Cranberries, LLC, would be debts arising out of a farming operation as the nature of that business is not in dispute, but debts related to JWB Livestock, LLC, and legal fees paid to Luvaas Cobb would not be. As it is unclear what the money was used for, I find Debtor has not satisfied the burden of showing whether the secured line of credit advances from Diana Bussmann are debts arising from a farming operation. Therefore, I will treat this debt as a non-farm debt in the eligibility calculation.

Finally, the Flagstar Home Mortgage Loan amount of $257,968 is not disputed. Joint Exhibits 6 and 7. Only the nature of the debt is in dispute. The debt calculations for § 101(18) exclude a debt for the debtor's principal residence of such individual unless the debt arises out of a farming operation. Like many chapter 12 eligibility issues, we lack controlling authority on when a debt for a principal residence "arises out of" a farming operation, but the parties have cited the *Woods* case. In *Woods*, the Tenth Circuit held that a debt for a personal residence arises out of a farming operation when it is "directly and substantially connected" to "any of the activities constituting a 'farming operation' within the meaning of" the statute. *Woods*, at 691. In determining whether there is a direct and substantial connection between the debt and the farming operation, the court applied a "direct-use" test that provides "if loan proceeds were used directly for or in a farming operation, the debt 'arises out of' that farming operation." *Id.*

In applying the direct-use test, I find the Flagstar home mortgage loan did not arise out of a farming operation. Debtor's testimony indicated a history of loans used to purchase the

property that make up his farming operations of JWB Livestock, LLC, and JWB Cranberries, LLC. *See* Exhibits 101, 102, 103, 104, 105, 106. Debtor testified that he first purchased the 100-acres of land in 1987 but did not build a personal residence on the property until 2005, indicating that he started building the personal residence in 2005 and completed it in 2006. He testified that he did not borrow money to build the residence, but that he used profits from his livestock and cranberry sales, and proceeds from a home sale in Port Orford to pay for the new home.

Amended Exhibit 6 includes a Note dated April 13, 2016, between Debtor as Borrower, and Umpqua Bank, as Lender, in the amount of $375,000.00. Amended Exhibit 6, pages 10-13. A related Deed of Trust, dated April 18, 2016, includes language at Paragraph 6 that states,

> Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing….

Amended Exhibit 6, page 18. In defining the property, the Deed of Trust lists the property address as 93032 Childers Road, Sixes, Oregon, which is Debtor's address. Amended Exhibit 6, page 15.

Testimony from Debtor during the hearing indicated that this loan was taken out to refinance the property and was later transferred from Umpqua Bank to Flagstar. Based on Debtor's testimony regarding the timing of the loans and the language of the Deed of Trust, it appears that the loan proceeds were used specifically for Debtor's residence and do not satisfy the direct-use test. The Flagstar loan, although a refinance of prior loans, appears to pertain only to the personal residence. I find no evidence that the loan proceeds were used directly for or in a farming operation. Further, Debtor's argument that the homestead property is an "integral part of the farm operation because the farm's books, and records are maintained in an office there and the farmhouse's proximity to the rest of the operation" allow Debtor to take care of his livestock,

cranberries, and bog systems is not persuasive. ECF No. 194, page 2. Debtor specifically testified that his bookkeeper, Diane Bussmann, kept the books for the LLCs, and no records were kept at his home. Diane Bussmann's testimony was consistent. Further, the Tenth Circuit in *Woods* specifically rejected the idea that a personal residence's proximity to the farming operation satisfied the direct-use test. *Woods*, at 706-07. For these reasons, I find that the Flagstar home mortgage loan, in the amount of $257,968, does not arise out of a farming operation and should not be included in the calculus when determining Debtor's chapter 12 eligibility.

### VI.    Farm-Debt Test - Chapter 12 Eligibility Calculation

Section 101(18) states that a "family farmer" is an "individual…engaged in a farming operation…not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual…unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual…." To determine whether Debtor is eligible for chapter 12 relief, I must calculate the farm-debt test under § 101(18)(A).

To the extent needed beyond statutory interpretation, the Tenth Circuit has provided helpful insight in determining how to structure the test. *See Acee v. Oneida Sav. Bank*, 529 B.R. 494 (N.D.N.Y. 2015) (citing *Woods*, at 696). In *Acee*, the court, following the analysis in *Woods* found that in calculating the test, the ordinary rule requires the debt for one's principal residence is not included in the aggregate debt, unless the exception applies and such debt "arises out of" a farming operation. Here, I found that the loan for Debtor's residence, the $257,968 Flagstar home mortgage loan, was not a debt arising out of farming operation. For this reason, I will exclude this debt from both the numerator and denominator of the farm-debt test calculation. The

numerator includes the farm debt, and the denominator is comprised of the "aggregate noncontingent, liquidated debt." *Acee*, at 499.

I find the debts are as follows:[8]

| Farm Debts | |
|---|---|
| $13,067 | John Deere Financial – Gator Loan (Claim 4) |
| $13,651 | NW Farm Credit – "Water Loan" |
| $321,159 | Stone Age loan (Claim 2) |
| $313,534 | Umpqua Bank – guaranty of loan to Bussmann Cranberries, LLC |
| **Total Farm Debt:** | **$661,411** |

| Non-Farm Debts | |
|---|---|
| $47,591 | Flagstar mortgage on North Bend residential rental (Claim 5) |
| $13,591 | Oregon Community Credit Union recreational trailer loan (no POC) |
| $27,187 | Rogue Credit Union – co-signed loan for stepson's car (Claim 1) |
| $436 | Bank of America – JWB Livestock Visa Bill (Claim 8) |
| $94,848 | NW Farm Credit – Line of Credit |
| $119,964 | Luvaas Cobb Legal Fees |
| $506,413 | Diana Bussmann 2021 secured line of credit advances (Claim 11) |
| $30,807 | NW CCU – Tahoe loan |
| **Total Non-Farm Debt:** | **$840,837** |

| Aggregate Noncontingent Liquidated Debt | (Total of Farm and Non-Farm Debts) |
|---|---|
| **Total** | **$1,502,248** |

| Debts Excluded from §101(18)(A) calculation | |
|---|---|
| $257,968 | Flagstar Home Mortgage Loan (Claim 7) |

---

[8] When calculating the final debt amounts and the chapter 12 eligibility calculation, I have rounded all numbers to the nearest whole dollar.

In making the § 101(18)(A) calculation, I must take the farm debts and divide them by the aggregate noncontingent liquidated debts to give the percentage of the debt arising out of Debtor's farming operations Here, that number is $661,411 divided by $1,502,248. The debt for Debtor's Flagstar home mortgage loan is not included in the calculus, based on my finding that this debt did not arise out of a farming operation, and supporting case law that excludes such loans from the § 101(18)(A) calculation. Based on my calculations, 44.03% of Debtor's debt on the date the case was filed arises out of a farming operation owned or operated by Debtor. Therefore, Debtor has not met the eligibility requirement for chapter 12 relief.

## VII.   Bad Faith

The Sisters, arguing bad faith, seek dismissal with prejudice to bar Debtor from filing any future bankruptcy related to these same debts. ECF No. 179, page 8. In evaluating bad faith in the Ninth Circuit, we apply a totality of the circumstances test considering the following factors: (1) whether the debtor misrepresented facts or unfairly manipulate the Code or filed the petition in an inequitable manner, (2) the debtor's history of bankruptcy filings, (3) whether debtor only intended to defeat state court litigation, and (4) whether egregious behavior is present. *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir. 1999) (citations omitted).

Debtor has no history of bankruptcy filings or dismissals, and the evidence points to no egregious behavior. As with most bankruptcy filings, outside pressure pushed Debtor to file bankruptcy. In this case, the pending state court litigation was that pressure, and Debtor filed to delay or stop the state court trial. This factor is present, but I don't find it to be determining. The real question is whether Debtor misrepresented facts or as described by the Sisters "concealed material facts and transactions in his petition." ECF No. 179, page 9. Debtor argues that the purported "missing information" was not required to be listed in the bankruptcy schedules and

statement of financial affairs. Disclosure of the debts and transactions in this case was complicated by the multiple entities related to Debtor and the overlap of transfers to and among the entities. Debtor's explanation and the advice of his attorney on the treatment in the statement of affairs provides an explanation for his actions. To be clear, when in doubt debtors in bankruptcy must make complete disclosures and list all creditors and possible assets in their schedules (even if a qualified listing), rather than find reasons not to make disclosures. Debtors also have a continuing duty to amend their schedules and statement of financial affairs as updated information becomes available. *See Searles v. Riley (In re Searles)*, 317 B.R. 368, 378 (9th BAP 2004), aff'd, 212 F.App'x 589 (9th Cir. 2006). Although a close case here, I find that the Sisters have not shown bad faith and that Debtor's actions do not amount to the bad faith necessary to warrant dismissal with prejudice.

## VIII. <u>Conclusion</u>

For the reasons stated above, the Sisters' Motion to Dismiss is granted. These are my findings of fact and conclusions of law under FRBP 7052 and FRCP 52, and they will not be separately stated. I will enter a separate order granting the motion to dismiss and directing that the court enter an order dismissing the case.

###